**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**PATRICK SCOTT WOLFE,**

       **Plaintiff,**

**v.**
                    **Civil Action No.: 1:10-CV-109
JUDGE KEELEY**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

       **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [13], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12],
AND AFFIRM THE RULING OF THE COMMISSIONER**

## I.  INTRODUCTION

On July 16, 2010, Plaintiff, Patrick Scott Wolfe ("Plaintiff"), by counsel Gail W. Kahle,

Esq., filed a complaint in this Court to obtain judicial review of the final decision of

Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or

"Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C.

§ 405(g). (Complaint, ECF No. 1)  On September 14, 2010, the Commissioner, by counsel

Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the

administrative record of the proceedings. (Answer, ECF No. 4; Administrative Record, ECF

No. 5) [1] On December 30, 2010, and January 27, 2011, Plaintiff and the Commissioner filed

---

[1]On November 1, 2011, the undersigned Magistrate Judge entered an Order For Plaintiff
to Show Cause why this case should not be dismissed.  On November 15, 2011, the undersigned
entered a Report and Recommendation to the District Judge recommending that this case be

their respective Motions for Summary Judgment. (Pl.'s Motion for Summ. J., ECF No. 12; Def.'s Motion for Summ. J., ECF No. 13)  Following review of the motions by the parties and administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

A.    Procedural History

On July 8, 2008,[2] Plaintiff applied for supplemental security income ("SSI") and disability insurance benefits ("DBI"), alleging disability beginning January 1, 2005.  (R. at 107-120)  Plaintiff's claim was initially denied on September 4, 2008, and denied again upon reconsideration on December 10, 2008.  (R. at 55-64, 66-71)  On January 6, 2009, Plaintiff filed a written request for a hearing, which was held before a United States Administrative Law Judge ("ALJ") on August 10, 2009, in Wheeling, West Virginia.  (R. at 72, 85-97)  On September 8, 2009, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act.  (R. at 12-22) On May 14, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-4)  Plaintiff now requests judicial review of the ALJ decision denying his application for disability.

---

dismissed.  On November 17, 2010, the Plaintiff filed an objection to the Report and Recommendation and a proposed Order withdrawing the same.  On December 2, 2010, an Order was entered withdrawing the Report and Recommendation dated November 15, 2010 and extending time for the Plaintiff to file his Motion in this case to January 2, 2011.

[2]The ALJ's decision lists June 27, 2008, as the date that Plaintiff filed his claim.  (R. at 12)  However, Plaintiff's application, listed as Exhibit 1D in the Administrative Record, references a date of July 8, 2008.  (R. at 107)  The only mention of June 27, 2008 in the application refers to Plaintiff's "fugitive felon/parole or probation violator status" as of that date. (R. at 108)

B.    Personal History

Plaintiff Patrick Scott Wolfe was born November 12, 1963, and was 44 years old at the time he initially applied for SSI and DBI.  (R. at 107, 182)  Plaintiff is a high school graduate and completed a two year associates degree in machine and welding.  (R. at 30)  Plaintiff worked as a machinist until 2005 when the plant closed . (R. at 32).    In addition, Plaintiff worked briefly in a machine shop for two months in July and August of 2006 and for three months in 2008 (R. at 168).  The ALJ found that the work performed in 2007 did not constitute substantial gainful activity and the work he performed in 2006 and 2008 was substantial but constituted an unsuccessful  work attempt.  (R. at 14).  Plaintiff is not married and has no children.  (R. at 31).  His girlfriend had recently moved in with him at the time of the hearing before the ALJ. (R. at 31).

C.    Medical History

Plaintiff underwent emergency room treatment at Reynolds Memorial Hospital in April of 2004.  (R. at 232).  Plaintiff indicated that a friend called the EMS after he passed out in front of the television.  (R. at 232).  The medical report indicated that Plaintiff's blood sugar level was 51 at the scene and 45 upon arrival at the ER.  (R. at 232).  He was diagnosed with hypoglycemia (low blood sugar), a syncopal episode, and hypoglycemia (low potassium)(R. at 232-233).  Plaintiff was examined at 8:15pm on April 19, 2004 and checked himself out of the hospital at 8:50pm on April 19, 2004 against medical advice. (R. at 231).

 In September of 2004, the Plaintiff reported to the emergency room at Wetzel County Hospital after becoming weak and disoriented at work, suffering from another hypoglycemic reaction.  (R. at 220).  After restoring his blood sugar level, the Plaintiff was

released from the hospital and sent home with a work excuse and told to follow up with his doctor as soon as possible. (R. at 220).

The Plaintiff has a history of treatment at Wheeling Health Right from 2005 to 2008 (R. at 247-92). At Plaintiff's first appointment at Wheeling Health Right on March 3, 2005, his physical examination was normal and he was diagnosed with Type I Diabetes, Hypertension, and Hyperlipidemia (R. at 288-289). Dr. Knestrick noted at that time that "He seems to have his diabetes, hypertension, and hyperlipidemia under pretty good control." (R. at 289). Further, the doctors notes reflected that the Plaintiff's weight was up to 252 ½ pounds and that although Plaintiff was trying to stick to a 2000 calorie ADA diet, he admitted not following it. (R. at 288). Plaintiff further admitted that he was sleeping "too much since he's been on strike" (R. at 288).

Plaintiff returned to Dr. Knestrick of Wheeling Health Right in August of 2006 to request medication refills but had no complaints at that time. (R. at 275). In fact, the Plaintiff reported that he was doing well and going to school now. (R. at 275). The physical examination was normal. (R. at 275). In October 2006, the Plaintiff followed up with Dr. Knestrick for medication refill and lab results. The physical examination was normal. (R. at 273). Dr. Knestrick reviewed the lab results with the Plaintiff and asked him to return in three (3) months for follow up. (R. at 273). Plaintiff reported back to Dr. Knestrick in June 2007. (R. at 270). Again, the physical examination was normal. (R. at 270). Again, lab results were discussed and the need for routine lab work reviewed. (R. at 270). In addition, the Doctor, reviewed with the Plaintiff that he needs to take his medications and should not stop taking them and the effects that non compliance would have. (R. at 270). Plaintiff followed up with Dr. Knestrick in July of 2007. (R. at 267). Again, Plaintiffs

physical examination was normal except for a small herniation of the umbulicus, which was able to be pushed back easily. (R. at 267). The doctors notes reflect that Defendant was doing well and had refills on record. (R. at 267). Lab results were discussed and Plaintiff was counseled on diet and exercise. (R. at 267). Plaintiff was told if hernia was not able to be pushed back in to go to the ER and to keep up the good BS and BP control. (R. at 268).

When Plaintiff returned in February of 2008 to Wheeling Health Right, he saw Dr. Kesner. His subjective complaints/HPI were as follows:

> "He states he is doing well, just fat. He states he is taking medications for his blood pressure, it runs normal. He thinks if he lost 50 lbs it would be a lot better. He states that his sugars are running 120-130, and he keeps them there. He has been on insulin since he was twelve. He is a type I diabetic. He is taking N/R. He has been taking 18 regular and 60 N about twelve hours apart. He does have a bad tooth though. He states he used to work at Ora Met. He just finished his associate's degree."

(R. at 264). His examination was normal except for joint pain. (R. at 265). The plan of treatment he discussed with his doctor on that date was as follows:

> "Continue the medications that he is already taking. He has been diabetic for a long time. He admits that he thinks most of his problem is because he has gained so much weight. Before we make any medication changes he does wish to try some therapeutic lifestyle changes and drop about 25-50 pounds if possible...."

(R. at 265).

When Plaintiff returned to Dr. Kesner in July of 2008, he reported as follows:

> "He states he has an appointment on 7/8 with SSI Disability due to his inability to get hired because of his diabetes. He states that his sugars have been running quite controlled lately. He states that he is trying to keep it around 110-120 ...He notices that his blood sugar drops with exercise so he takes more or less depending on his level of activity.

(R. at 253). Dr. Kesner reported that Plaintiff was having some lows, which put him at risk.

"However, having the tight control has helped him tremendously as he currently has no neuropathy." (R. at 254). Dr. Kesner discussed the following plan of treatment with the Plaintiff:

> He would like to get on Social security disability, but his main problem is hypoglycemia. He controls his insulin very tightly, but if we did not control it so closely, it is unlikely that he would have the lows which cause him trouble. I do not believe he would be eligible for social security based on this. If we adjust his insulin, we should be able to find an acceptable level where he isn't having hypoglycemia."

(R. at 254). On July 25, 2008, Dr. Kesner completed a form for Plaintiff's application for state medicaid benefits. (R. at 262-263). He diagnosed Plaintiff with Type I Diabetes Mellitus and hypoglycemia (R. at 262). He indicated that Plaintiff's condition was under "good control" with no neuropathy or retinopathy. (R. at 262). He identified Plaintiff's sole employment limitation as an inability to handle large machinery due to "occasional lows" (in blood sugar) (R. at 262).

In August of 2008, Plaintiff underwent an eye examination by Joseph Auda, O.D. to evaluate his vision. (R. at 237). Plaintiff had no visual complaints and testing revealed visual acuity at 20/20 in both eyes (R. at 237). Plaintiff was diagnosed with diabetes without retinal involvement, cataracts with no current visual impact, myopia, astigmatism and presbyopia, requiring glasses. (R. at 237).

In October of 2008, the Plaintiff returned to Dr. Kesner for follow up care. (R. at 248). Plaintiff's subjective complaints/HPI were as follows:

> He states his blood sugars have been running fairly good. He states he has been depressed over the disability thing. He states he has been doing what he can on the side. He did lay tile this morning. He states he has not had any low blood sugars since the last time he has been here. He states it fluctuates of course.

(R. at 248). Plaintiff's physical examination was normal. (R. at 248).

In addition, to the records of Plaintiff's treating physicians, Plaintiff has provided letters from two doctors who provided opinions to Plaintiff's counsel in support of his claim for benefits. Both of these doctors work at the same address 1001 Third Street, Moundsville, WV. The first letter is from Trent G. Mason, M.D., dated June 4, 2009, and states that Plaintiff was "medically disabled" and unable to "sustain any gainful employment" (R. at 308). Dr. Mason explained in his letter that Plaintiff had unstable, brittle, labile Type I Diabetes, that resulted in unpredictable blood sugar levels, syncopal episodes, and low blood sugar on numerous occasions (R. at 308). He opined that there were many jobs that Plaintiff might be qualified for, but he would not be a candidate for them because he needed to test his blood sugar frequently. (R. at 308). Therefore, he did not consider Plaintiff able to sustain any type of employment (R. at 308).

The second letter is dated July 28, 2009 and is from Robert B. Wade, M.D.[3] In his letter, Dr. Wade stated that he had known Plaintiff for several years and that he was well aware that Plaintiff had long-standing Type I Diabetes (R. at 309). He indicated that Plaintiff had frequent hyperglycemic episodes which were often unannounced, and despite frequent monitoring, Plaintiff continued to have difficulty with labile blood sugar levels (R. at 309). He concluded that having unannounced hyperglycemic episodes would make it difficult to be employed and for that reason, he considered Plaintiff to be unemployable. (R. at 309).

D.    Testimonial Evidence

---

[3] The transcript from the hearing on August 10, 2009 mistakenly refers to Dr. Wade as "Dr. Lee". See p35.

At the ALJ hearing held on August 10, 2009, Plaintiff testified that he was a high school graduate and had obtained his two year associates degree in machine and welding. (R. at 30-31) . He completed one year of his associates degree after high school and the other year between 2006 and 2007 (R. at 31). The Plaintiff has a current drivers license with no restrictions. (R. at 31). The Plaintiff is not married, has no children but recently his girlfriend moved in with him. (R. at 31). As far as Plaintiff's work history, he worked for Floor Mast as a machinist. (R. at 32). In December of 2005, he was terminated from that job during a strike situation and the mill shut down shortly thereafter. (R. at 32). In 2006, Plaintiff worked as a machinist for Dye Tech for about a month and in 2008, Plaintiff worked as a machinist for Nemeth for approximately three months. (R. at 33). The Plaintiff completed his Associates Degree in Machine and Welding in 2006-2007. (R. at 33). Plaintiff testified that other than those jobs he has had no work since 2005, not even jobs that were off the books. (R. at 33).

Plaintiff further testified describing his hypoglycemic episodes as follows:

A.       ...About once every seven, eight days is a good average, yes. It's hard to tell, you know you can be doing anything and it'll just hit you. You'll get disoriented and after somebody sticks glucose in my mouth because I never have, you don't have enough sense to take them yourself because you don't know what's going on. And in the drain, just soaked with sweat, you know, it's just draining and you just don't have the, you can remember after your blood sugar comes back up you can remember being disoriented but while you're disoriented you can't do, you have no idea where you're at.

Q.    How long will this disorientation period last?

A.    Ten to 15 minutes.

Q    Then your blood sugar will start to come up?

A.    Yeah, you remember who you are, where you're at...

(R. at 38). When explaining the letter submitted by Dr. Mason on Plaintiff's behalf, the Plaintiff testified as follows:

| | |
|---|---|
| Q | And this [Dr. Mason] is the doctor that you see regularly? How long have you been seeing him? |
| A | Yes Sir, I've been a good while and he helps take care of me when I need, if I needed something being uninsured. |
| Q | Okay. Is he a family practitioner? |
| A | Yes, sir, yes sir |
| Q | How long have you seen him in the last couple of years? |
| A | Nothing on record. You know, he lives out in the hill from me a couple of miles." |

(R. at 34). When explaining the letter submitted by Dr. Wade (placed upon the record as

"Dr. Lee" See footnote 2) on Plaintiff's behalf, Plaintiff testified as follows:

| | |
|---|---|
| Q | And what about, we have a statement from Dr. Lee [Wade]. Who is Dr. Lee [Wade]? |
| A | He's a general practitioner as well. |
| Q | And how long have you been seeing Dr. Lee [Wade]? |
| A | I haven't seen the fellow you know to go into his office but he's in practice with Dr Mason and he knows what I go through and being without insurance you know, if I needed something or a prescription or something he would help me out. |
| Q | Was this after, was Dr. Kesner prescribing all your medication? |
| A | Yes, sir. |
| Q | And you last saw Dr. Kesner in March 2009? So how are you getting your prescriptions now? |
| A | Through Wheeling Health [INAUDIBLE]. |
| Q | You still get it through Wheeling Health? |
| A | Yes, Sir. |

(R. at 35).

Dr. William Reed, a vocational expert also testified at the hearing on August 10,

2009. (R at. 45-53). Dr. Reed asked a few questions of the Claimant then testified as

follows:

| | |
|---|---|
| Q | Let's assume for the first hypothetical we have a younger individual with the education of the claimant and work background you've described. Let's assume this individual can perform sedentary, light or even medium exertion as those terms are defined in the Social Security regulations. Let's assume that this individual should never have to climb ladders, ropes or scaffolds. In terms of postural limitations let's say that he would be limited to occasional, well no |

that's [INAUDIBLE] stair climbing, balancing, stooping, kneeling, crouching, let's assume that those are not limited per say.

A    Okay

Q    In terms of environmental limitations let's assume that he should have, he should have no exposure to hazards, hazardous situation, unprotected heights, dangerous machinery. Let's assume that in terms of operating moving equipment it should be limited to no more than occasional. Let's assume for purposes of this hypothetical that there should be no concentrated exposure to excessive heat or cold. Let's assume for the first hypothetical that he would be capable of performing work duties on a regular basis with the normal breaks every two hours, a longer break for lunch, and that he could accomplish his blood sugar checks and his need to inject himself during those breaks for example. With those limitations would such an individual be able to perform the claimant's past work?

A    No, Your Honor

Q    Would there be other, let's talk about unskilled work that such an individual could perform?

A    Yes, Your Honor there would be given those limitations. The following are representative example of work that I believe would meet the limitations of the hypothetical. I'll give you one in each category unless you want them otherwise....

A    ... In the medium; unskilled category there would be such work as janitors. One representative DOT title and number is that of a sweeper and cleaner, DOT number is 389.683-010. It's unskilled work with a SVP of 2, medium. During the relevant period there were more than 1.6 million jobs....

A    .... Janitor in West Virginia, estimated 11.420.... Another representative example in the light, unskilled category would be that of light, unskilled cashiers. DOT number ... 211.462-010. In the light, unskilled category nationally three and a half million, West Virginia 23, 480. A final representative example would be that in a sedentary, unskilled category of assembler. One representative title is that of a lens inserter. DOT number 713.687-026. It is unskilled with an SVP of 2.... Assemblers, 285,000 in the sedentary unskilled and in West Virginia 680. Those numbers are from Occubrowse which is a computer program which crosswalks DOT number with census data and the sources are Bureau of Labor Statistics....

Q    If we keep those same limitations and add a restriction whereby the individual would need an additional one or two ten-minute breaks during the workday how would that affect your answer to the last question?

A    Quite frankly it depends on the job that one is doing. Cashier would be difficult to do that, same with assembler. A janitor is often off by himself cleaning and I believe could work in a ten-minute break

without seriously affecting the work.

Q    Would there be other jobs in the, within that hypothetical that I gave you that would be able to perform?

A    Yes, Your Honor.  Another representative example would be that of light, unskilled housekeeping cleaners, mostly in the hotel/motel industry.  They work on their own.  They take the amount of time they need to get the room done so I believe it's possible to take a ten-minute break....   And the final representative example would be that of certain types of security guards in the unskilled category....

A    ...There would be certain types of sedentary unskilled security guards such as those that observe a surveillance system monitor, DOT number 379.367-010.  It's unskilled with a SVP of 2 and sedentary. I estimate 95,000 jobs nationally, estimate 250 in West Virginia....

Q    If the individual, due to symptoms, had to leave work or miss work on a monthly basis what would be the competitive guideline for that?

A    For a new hire, unskilled employee I read a recent study to indicate they get about eight days a year nationally.  Four or five vacations days, a couple of holidays and one or two sick days kind of thing.  So anything beyond that, certainly one day or more a month especially at the probationary period of employment probably would not be tolerated.

(R. at 48-53).

F.    <u>Lifestyle Evidence</u>

Plaintiff wrote in his Function Report for the Social Security Administration the following description of what he does daily:

Check my sugar.  Take my medicines.  Eat 1 hour Later when meds have taken full effect, check my sugar one hour after I eat to make sure of blood sugar reading. Check sugar at noon, if it is too high.  I take a shot of insulin. Then eat an hour later, check my sugar at dinner, take my required insulin and eat 1 hour later, check sugar before bedtime and take required food or meds.

(R. at 161, 167)

Plaintiff further states that he has a pet that he feeds, walks and takes to the vet when necessary. (R.  at 161).   Plaintiff prepares his own meals, cleans, does his laundry, mows his lawn and does the needed house hold repairs.  (R.  at 162).  Plaintiff gets outside a lot

and shops for his own groceries.  (R. at162).  Plaintiff's hobby's are hunting and television.
(R. at162).  Plaintiff describes the changes in his social activities since this condition began
as follows: "can't drink, can't get too much distance from meter, glucose, insulin" ( R. at
165).  Plaintiff's only complaint is that he is "afraid to do too much, sugar may get low and
I may pass out, vision goes in and out." (R. at 164).

### III.  CONTENTIONS OF THE PARTIES

Plaintiff, in his motion for summary judgment, alleges that the decision of the ALJ
is not supported by substantial evidence.  (See Pl.'s Br. in Supp. of Mot. for Summ. J. 5,
ECF No. 15)  Specifically, Plaintiff argues that the ALJ:

1.      did not apply the second step of the two-step subjective pain analysis
        set forth in SSR 96-7p because he rejected the opinion evidence of
        Doctors Wade and Mason and the supporting sworn testimony of
        Plaintiff.

2.      did not consider the mandatory guidelines as set forth in 20CFR
        416.927(d) in evaluating the opinions of Dr. Mason and Dr. Wade and
        gave undue weight to  notes of a single treating physician, Dr. Kesner
        (Pl's Br. 6).

3.      did not explicitly weigh relevant, probative and available evidence in
        arriving at his decision. (Pl.'s Br. 7).

In response, Defendant argues in his motion for summary judgment that the ALJ's final
decision denying Plaintiff's claim for SSI benefits is supported by substantial evidence.
Specifically, Defendant argues that:

1.      The ALJ properly evaluated the medical source opinions of Dr. Wade

and Dr. Mason in accordance with the regulations. (Def.'s Br. 10-12);

2.    the ALJ properly evaluated Plaintiff's subjective complaints (Def.'s Br. 12-14);

3.    the evidence in the record did not support Plaintiff's subjective complaints and the ALJ properly weighed this evidence when he concluded that Plaintiff's testimony was not fully credible (Def.'s Br. 13);

4.    the ALJ properly rejected Dr. Mason and Dr. Wades's evaluation of Plaintiff's ability to work because their letters provide no support for their conclusions and the ALJ is not required to consider or accept their statements that Plaintiff is disabled (Def.'s Br. 10-12);

5.    the ALJ's RFC assessment is supported by evidence in the record indicating that Plaintiff could conduct his daily activities and posed a hypothetical to the Vocational Expert that took into account the characteristics of Plaintiff as developed in the record. (Def.'s Br. 9-10).

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence

> as a reasonable person might accept as adequate to support a conclusion."
> Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing
> Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216
> (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the
> case before a jury, then there is "substantial evidence." Laws v. Celebrezze,
> 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a
> reviewing court to determine the weight of the evidence, nor is it the court's
> function to substitute its judgment . . . if the decision is supported by
> substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v.
> Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether

there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find

facts or try the case de novo when reviewing disability determinations." Seacrist v.

Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of §**

**205(g) . . . requires that the court uphold the decision even should the court disagree**

**with such decision as long as it is supported by 'substantial evidence.'"** Blalock v.

Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A.  Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following
criteria:

> An individual shall be determined to be under a disability only if his physical
> or mental impairment or impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists
> in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work . . . .
> "[W]ork which exists in the national economy" means work which exists in
> significant numbers either in the region where such individual lives or in
> several regions of the country.

See 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

> (I) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
> 20 C.F.R. § 404.1520.]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520.  If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step.  Id.

B.    The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

> **1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010**  (R. at 14)

> **2.    The claimant has not engaged in substantial gainful activity**

since January 1, 2005, the alleged onset date (20CFR 404.1571 et seq., and 416.971 et seq). (R. at 14)

3.     The claimant has the following severe impairments: insulin-dependent diabetes mellitus (20CFR 404.1520(c) and 416.920(c) (R. at 15)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20CFR Part 404, Subpart P, Appendix 1 (20 CFR404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (R. at 17)

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20CFR 404.1567(c) and 416.967(c) except that he should never climb ladders, ropes or scaffolds. He should avoid exposure t hazards and should avoid concentrated exposure to excessive heart or cold. The claimant is capable of driving occasionally. He does not require more than the usual break/lunch schedule. (R. at 18)

6.     The claimant is unable to perform any past relevant work (20CFR 404.1565 and 416.965 (R. at 20)

7.     The claimant was born on November 12, 1963 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20CFR 404.1563 and 416.964). (R. at 20)

8.     The Claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964). (R. at 20)

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or no the claimant has transferable job skills (See SSR 82-41 and 20CFR Part 404, Subpart P, Appendix 2 (R. at 20)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20CFR 404.1569, 404.1569(a), 416.969 and 416.969

(R. at 20)

**11.    The Claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).** (R. at 21)

C.    <u>The ALJ Properly Applied SSR 96-7p In Making His Credibility Determination And That Determination Is Supported By Substantial Evidence</u>

Plaintiff argues that the ALJ's credibility determination lacks substantial evidence because he did not properly apply step two of SSR 96-7p.  (Pl.'s Br. 11-12)  Specifically, Plaintiff argues that the "ALJ completely discounts Plaintiff's own testimony of his disabling hypoglycemic episodes of 40-50 times on a yearly basis, as well as the entirety of Dr. Mason and Dr. Wade's medical reports. ( Pl.'s Br. 7).  In response, Defendant argues that the ALJ gave numerous and reasonable explanations for finding the Plaintiff's testimony was not fully credible (Def.'s Br. 13)

The determination of whether a person is disabled by pain or other symptoms is a two step process.  <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).  First, there must be objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged."  <u>Id.</u> (quoting 20 C.F.R. §§ 416.929(b), 404.1529(b)).  Second, once this threshold determination has been made, the ALJ must consider the credibility of his subjective allegations of pain in light of the entire record.  <u>See id.</u> at 595.  Social Security Ruling 96-7p sets out detailed guidelines for assessing the credibility of an individual's subjective allegations of pain, listing the following factors to be considered in making a credibility determination:

1.    The individual's daily activities;

2.     The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.     Factors that precipitate and aggravate the symptoms;

4.     The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.     Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.     Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.     Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight.  Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).  However, the ALJ's determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374,186, at *2.

Neither Plaintiff nor Defendant dispute the ALJ's conclusion that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms .."  (R. at 19)  Because the objective medical evidence in the record indicates that Plaintiff does in fact suffer from these conditions, it was proper for the ALJ to assess the credibility of Plaintiff's testimony about his symptoms.  See Craig, 76 F.3d 585.  In making his credibility determination, the ALJ's opinion included evidence pertaining to all seven factors listed in SSR 96-7p.  First, the ALJ discussed evidence of Plaintiff's

daily activities:

> The alleged disability onset date is not related to impairments but to the claimant's employer closing the business following a strike by workers....The claimant essentially attended school full time during 2006 to 2007 completing an AA degree...It is also notable that the claimant reported in October 2008 that he had been laying tile and doing other work "on the side" (Exhibit 5F)....

(R. at 19)

> Second, the ALJ discussed the location, duration, frequency, and intensity of the

Plaintiff's symptoms:

> He [Plaintiff] stated that he has hypoglycemic episodes once every seven to eight days that come on without warning and cause disorientation. He last went to the emergency room about one year ago... He does not drive a lot because of this. He stated that he has to check his blood sugar every two hours when he is awake, and that it takes him ten minutes to check it and take his shot. The claimant stated that he needs a private sanitary area to do this. He stated that the predictability and disorientation of these episodes is his big problem now.

(R. at 18-19) The ALJ further reviewed Plaintiffs alleged systems as follows:

> In terms of the claimant's alleged labile diabetes and hypoglycemic episodes, the undersigned finds that the objective medical evidence does not indicate that the claimant's diabetic control is as poor as he has stated. While he indicates that he was seen in the emergency room for hypoglycemia one year ago, the record only shows two ER visits in 2004 (Exhibits 1F and 2F). There are large gaps in the treatment records but relatively well-controlled blood sugar on returns to treatment. (Exhibits 1F and 2F)....There are no reports of frequent hypoglycemic episodes in the medical records.

 (R. at 19).

> Third, the ALJ mentioned factors that precipitate or aggravate the above symptoms,

such as:

> The claimant is a long-time diabetic....While he may not be able to perform work as a machinist, which required longer than normal work shifts and would be dangerous with his condition, he possesses the capability for other functional activities.

(R. at 19)

Fourth, the ALJ noted that "Records from Wheeling Health Right indicate that the claimant's physical examinations were consistently unremarkable, and that his blood sugar and hypertension were well-controlled despite obvious failure to comply with a diabetic diet (Exhibit 1F and 2F)." (R. at 19).  In addition, Plaintiff indicated that he has no side effects from the medication he takes.  (R.  at 157).

Fifth, the ALJ noted the following regarding Plaintiff's treatment for these symptoms:,

> Further, the claimant's treating source setting appointments at only six month intervals would not be compatible with allegations of frequent hypoglycemic attacks.  Also lacking in credibility is the allegation that Dr. Kesner was to provide a statement of disability when Dr. Kesner indicated he did not believe the claimant was disabled.  Treatment records do not provide any contradictory evidence.

(R. at 19).

Sixth, the ALJ noted that Plaintiff has attempted but failed to comply with a diabetic diet.  (R. at 19)

Finally, the ALJ took into account other factors concerning Plaintiff's functional limitations.

> As for the opinion evidence, the undersigned has considered the opinions of the claimant's treating and examining physicians in reaching a decision in this matter (20 CFR 404.1527 and 416.927) While Dr. Kesner's opinion regarding the claimant's eligibility for disability (Exhibit 5F) is an opinion on an issue reserved to the commissioner (20CFR404.1527 (e)(1) and 416.927 (e)(1), the undersigned has taken note of Dr. Kesner's refusal to give the claimant a statement indicating he was unable to work.  In regard to the statements of Dr. Wade and Dr. Mason (Exhibits 8F and 9F) the undersigned finds that these doctors do not have a treating or examining relationship with the claimant.  Further, their opinions that the claimant is unable to work are also opinions on an issue reserved to the Commissioner.

(R. at 20).

As noted above, the ALJ considered evidence pertaining to all seven factors listed in SSR 96-7p. Therefore, the undersigned Magistrate Judge finds that the ALJ properly applied the second step of the analysis required under SSR 96-7p.

After considering the factors contained in SSR 96-7p, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 19) In reaching this conclusion, the ALJ determined that Plaintiff's alleged labile diabetes and frequent hypoglycemic episodes is not supported by the objective medical evidence which does not indicate that claimant's diabetic control is as poor as he has stated. (R. at 19). The ALJ also determined that Plaintiff's complaints were inconsistent with his medical history. Although Plaintiff complains that he has 40-50 hypoglycemic episodes per year (Pl.'s Br 7), the medical evidence shows only two ER visits in 2004 (Exhibits 1F and 2F) (R. at 19).

In conclusion, the undersigned Magistrate finds that the ALJ's credibility determination was made in accordance with the law and is supported by substantial evidence in the record.

D.   The ALJ Properly Evaluated the Medical Source Opinions of Dr. Mason and Dr. Wade as Required by the Regulations and gave proper weight to Dr. Kesner's opinions

Plaintiff's next assignment of error is that the ALJ did not follow 20CFR 416.927 (d) when he considered the opinions of Dr. Mason and Dr. Wade and Dr. Kesner (Pl.'s Br. 6) Defendant, in turn, argues that the ALJ properly afforded little weight to Dr. Mason and Dr. Wades opinion letters that stated that Plaintiff was "disabled" and "unable to work" because

Dr. Mason and Dr. Wade did not have a treating relationship with Plaintiff. (Def Br. 10). In addition, Defendant contends that even if Dr. Mason and Dr. Wade had treated the Plaintiff in person, there are no medical records to document, what, if any , medical care those doctors provided. (Def.'s Br. 10). Additionally, Dr. Mason and Dr. Wade's opinions that the claimants blood sugar levels were labile were not supported by the medical evidence, which consistently showed that his diabetes was under control (Def.'s Br. 10). Furthermore, the opinion that a claimant is "disabled" and "unable to work" is one that is reserved to the Commissioner and thus, entitled to no weight. (Def.'s Br. 10).

SSR 96-5p provides a policy interpretation for "medical source opinions on issues reserved to the Commissioner," including residual functional capacity assessments. SSR 96-5p, 1996 WL 374183 (July 2, 1996). According to SSR 96-5p, the regulations assign special significance to the opinions of treating sources, and in some instances these opinions are entitled to controlling weight. Id. at *2. However, treating source opinions on issues reserved for the Commissioner, such as the RFC assessment, "are never entitled to controlling weight or special significance." Id. The adjudicator must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 and 416.927, and must adopt in his RFC any treating source medical opinion that is assigned controlling weight under the rules. Id. at *5. In weighing medical source statements under the regulations, "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) . . . is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Initially, it is important to note that Dr. Mason and Dr. Wade's opinion that Plaintiff is unemployable and disabled secondary to his labile blood sugar is a legal conclusion

reserved for the Commissioner and not a medical opinion.  See Morgan v. Barnhart, 142 Fed.App'x 716, 722 (4th Cir. 2005) (not selected for publication) (finding that physician's statement that claimant "can't work a total of an 8 hour day" is a legal conclusion with no evidentiary value); see also 20 C.F.R. § 404.1527(e).  Because this portion of Dr. Mason and Dr. Wade's opinion is not medical evidence, the undersigned Magistrate Judge finds that the ALJ was not required to assign it controlling weight in formulating Plaintiff's RFC.

Although Dr. Mason and Dr. Wade's opinion on the ultimate issue is not controlling, the fact remains that the ALJ was required to evaluate the medical opinions contained in the remainder of their opinion letter.  In this case, the ALJ determined as follows:

> In regard to the statements of Dr. Wade and Dr. Mason (Exhibit 8F and 9F) the undersigned finds that these doctors do not have a treating or examining relationship with the claimant.

(R. at 20).  This finding complies with factors that the ALJ was required to consider in 20 CFR§ 416.927(d).  Since the Plaintiff had no examining or treating relationship with these doctors, there were no lab reports or any documents to support their treatment of the Plaintiff and in fact their opinions were inconsistent with the lab reports and other documents from treating physicians that were supplied in this case.  (R. at 308, 309, 247-92).  For example, Dr. Mason reports in his letter about the Plaintiff  that  "Unfortunately he has unstable brittle labile Type I diabetes that give him unpredicted blood sugars and has left him numerous times with syncopal episodes and low blood sugar attacks and **many trips to the ER** in an ambulance because of this."  (Emphasis added R. at 308).  The ALJ finds that "...the record only shows two ER visits in 2004 (Exhibits 1F and 2F) and none since that time. (R. at 19).  In addition, the ALJ finds that "There are no reports of frequent hypoglycemic episodes in the medical records." (R. at 19).  Therefore, not only did, Dr.

Mason and Dr. Wade's opinions letters address issues solely reserved to the commissioner but the statements in the letters were inconsistent with other substantial evidence in the case record, and the ALJ properly did not give them controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d).

Dr. Kesner was one of several doctors who treated the Plaintiff at Wheeling Health Right from 2005 through October 2008. (R. at 247-292). The ALJ correctly considered Dr. Kesner's opinion as he was one of Plaintiff's treating physicians from Wheeling Health Right. Dr. Kesner, opined that Plaintiff's diabetes was under good control and his only work-related limitation was his inability to handle large machinery due to occasional low blood sugar levels (R. at 262). See 20CFR404.1527(d)(2), 416.927(d)(2)(providing for controlling weight where a treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record). Dr. Kesner's opinion was well-supported by his progress notes (which showed Plaintiff's blood sugar levels were under control), by evidence that Plaintiff had only two documented incidents of low blood sugar (both before his 2005 alleged onset date of disability), by evidence that plaintiff obtained an associate's degree in 2007 (during which time he alleged he was disabled), and by evidence, although minimal, that Plaintiff worked small jobs (e.g., laying tile) (R. at 220-23, 232-33, 247-92).

For these reasons, the undersigned Magistrate Judge finds that substantial evidence supported the ALJ's decision to assign less weight to Dr. Mason and Dr. Wade's medical opinions and more weight to Dr. Kesner's opinion and that the ALJ correctly applied the law in this situation.

E.      The ALJ weighed all the relevant, probative and available evidence in arriving at his

decision.

Lastly, the Plaintiff argues that the ALJ erred in failing to weigh relevant, probative and available evidence in arriving at a decision on the plaintiff's claim for disability benefits. (Pl.'s Br. 7). Specifically, the Plaintiff asserts again that the ALJ discounted Plaintiff's testimony that he has "40-50" hypoglycemic episodes on a yearly basis, as well as the entirety of Dr. Mason's and Dr Wades opinion letters. (Pl.'s Br. 7)

The Defendant's asserts that the ALJ correctly considered and weighed all the relevant, probative and available evidence. (Pl.'s Br. 13).

The undersigned finds that the ALJ correctly considered evidence pertaining to all seven factors listed in SSR 96-7p in reaching his determination that "the claimant's allegations are not fully credible." (R. at 19). In addition, the undersigned finds that there was substantial evidence to support the ALJ finding regarding credibility. In addition, the ALJ correctly applied SSR 96-5 and 20CFR 404.1527(e) and 416.927(d) in considering the opinion evidence of Dr. Mason, Dr. Wade and Dr. Kesner.

The undersigned finds that after reviewing all the relevant, probative and available evidence, the ALJ correctly applied the law in this case and that his findings were supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, the undersigned Magistrate Judge finds that substantial evidence supports the Commissioner's decision denying Plaintiff's application for Supplemental Security Income and Disability Income Benefits. Accordingly, the undersigned Magistrate recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 13) be

**GRANTED**, and the Decision of the Administrative Law Judge be **AFFIRMED** because:

1.  the ALJ properly applied SSR 96-7p in making his credibility determination and that determination is supported by substantial evidence;

2.  the ALJ properly weighed the opinions of Dr. Mason and Dr. Wade and Dr.Kesner as required by SSR 96-5p 20CFR 404.1527(d)(2) and 20 CFR§416.927(d)(2); and his decision was supported by substantial evidence; and

3.  The ALJ weighed all the relevant, probative and available evidence, correctly applied the law and supported his decision with substantial evidence.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 28thday of **March**, **2010**.


DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE