IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PATRICK SCOTT WOLFE,

        Plaintiff,

v.                                    CIVIL ACTION NO. 1:10CV109
                                      (Judge Keeley)

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S OPINION/REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Fed. R. Civ. P. 72(b), and L.R. Civ. P. 4.01(d), on July 16, 2010, the Court referred this Social Security action to United States Magistrate Judge David J. Joel with directions to submit proposed findings of fact and a recommendation for disposition.

On March 28, 2011, Magistrate Judge Joel filed his Report and Recommendation ("R&R") (dkt. no. 15). In accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 6(e), he directed the parties to file written objections to the R&R with the Clerk of Court within fourteen (14) days after being served with a copy of the R&R. On April 13, 2011, counsel for the plaintiff, Patrick Scott Wolfe ("Wolfe"), filed objections to the R&R (dkt. no. 16), to which the Commissioner responded on April 27, 2011 (dkt. no. 17).

## I. PROCEDURAL BACKGROUND

On July 8, 2008, Wolfe applied for supplemental security income ("SSI") and disability insurance benefits ("DIB"), alleging a disability onset of January 1, 2005 (R. 107-120). The

Commissioner initially denied Wolfe's claim on September 4, 2008, and later on reconsideration on December 10, 2008 (R. 55-64, 66-71). On August 10, 2009, an ALJ conducted a hearing at which Wolfe and a vocational expert appeared and testified (R. 30-31, 45-53).

Following that hearing, on September 8, 2009, the ALJ determined that Wolfe was not disabled within the meaning of the Social Security Act (R. 12-22). Thereafter, on April 14, 2010, the Appeals Council denied Wolfe's request for review, thus making the September 8, 2009 decision of the ALJ the final decision of the Commissioner (R. 1-4). Finally, on July 16, 2010, Wolfe filed this action seeking judicial review of that decision (dkt. no. 1).

## II.  PLAINTIFF'S BACKGROUND

Wolfe was forty-four (44) years old when he initially applied for benefits. Pursuant to 20 CFR §§ 401.1563 and 416.963, he is considered a younger individual, age 18-49.  He is a high school graduate and has a two year associate degree in machine and welding (R. 30-31). While employed, Wolfe worked as a machinist (R. 32-33).

## III.  ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process established in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

1.  Wolfe met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and was insured for benefits through December 31, 2010 (R. 14);

2.  Wolfe has not engaged in substantial gainful activity since January 1, 2005, the alleged onset date (R. 14);

3.  Wolfe's insulin diabetes mellitus is a severe impairment that does not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 15, 17);

4.  Wolfe retains the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that he should never climb ladders, ropes or scaffolds, should avoid exposure to hazards and excessive heat or cold, can drive occasionally and does not require more than a normal break and lunch schedule (R. 18);

5.  Wolfe is unable to perform any of his past relevant work (20 CFR § 404.1565 and 416.965) (R. 20);

6.  Wolfe was 41 year old on the alleged onset date and is considered a younger individual age 18-49 (20 CFR § 404.1563 and 416.964) (R. 20);

7.  Wolfe has a high school education and is able to communicate in English (20 CFR § 404.1564 and 416.964) (R. 20);

8.  Wolfe has no transferable skills from any past relevant work and transferability of skills is not an issue in this case because the Medical-Vocational Rules used as a framework support a finding of not disabled (SSR 82041 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 20);

9.   There are a significant number of jobs in the
     national economy that Wolfe can perform even
     considering his age, education, work experience and
     residual functional capacity (20 CFR 404.1569, 404.
     1569(a) and 416.969) (R. 20); and

10.  Wolfe has not been under a "disability," as defined in
     the Social Security Act, from January 1, 2005 through the
     date of the ALJ's decision (20 CFR 404.1520(g) and
     416.920(g)) (R. 21).

## IV.  PLAINTIFF'S OBJECTIONS

Wolfe objects to sub-sections D and E of the R&R. He contends
that the Magistrate Judge erred when he adopted the "flawed"
analysis of the ALJ. Those flaws include that the ALJ 1) failed to
apply the proper standards of review in his consideration of the
evidence provided by Drs. Mason and Wade,[1] and 2) failed to make a
proper credibility determination regarding Wolfe's testimony during
the hearing (Pla.'s Objs. dkt. no. 16).

The Commissioner contends that Wolfe's objections are no
different from those he filed initially, that the record contains
substantial evidence to support the ALJ's decision that Wolfe is
not disabled. (Def.'s Response dkt. no. 17).

## V.  MEDICAL EVIDENCE

The medical evidence in the case includes the following:

---

[1] The August 10, 2009 hearing transcript mistakenly refers to
Dr. Wade as "Dr. Lee".  See p. 35.

4

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

1.   An April 19, 2004 emergency room treatment report from Mark Perni, D.O., Reynolds Memorial Hospital, indicating that Wolfe reported he had passed out in front of the television and a friend had to call EMS. (R. 232). The report documents Wolfe's blood sugar level as 51 at home and 45 on arrival at the ER. (R. at 232). The diagnosis was hypoglycemia (low blood sugar), a syncopal episode, and hypokalemia (low potassium)(R. 232-233). Wolfe reported no pain, nausea, vomiting, shortness of breath, dizziness, peripheral paralysis or paresthesia and refused further studies, including a urinalysis. He left the ER at 8:50 P.M. on April 19, 2004 against medical advice (R. 231);

2.   A September 17, 2004, out-patient report from the Wetzel County Hospital emergency room indicating Wolfe reported becoming weak and disoriented at work.  The report documented that Wolfe's blood sugar reading at 8:35 A.M. was 63 and at 9:20 A.M. was 158. The diagnosis was hypoglycemic reaction. (R. 220). When released from the hospital, the doctor  instructed Wolfe to follow up with his doctor as soon as possible (R. 220);

3.   A March 3, 2005 report from Joyce Knestrick, CFNP, Ph.D, regarding Wolfe's first appointment with Wheeling Health Right ("WHR"). Dr. Knestrick's diagnosis was Type I Diabetes, Hypertension, and Hyperlipidemia that seemed to be "under pretty

good control." (R. 288, 289).  Physical examination indicated a
weight increase to 252-1/2 pounds despite attempts to adhere to a
2000 calorie diet. Wolfe admitted that he was not following the
diet and was sleeping "too much since he's been on strike" (R.
288);

4.    An August 31, 2006 report from Dr. Knestrick, indicting
that Wolfe had requested refills of his medication, had no
complaints, was doing well and going to school. The physical
examination was normal, his weight was 244 pounds and there were no
open areas on his feet. Dr. Knestrick instructed Wolfe to continue
his current medications and to follow up in one month (R. 275);

5.    Another report from Dr. Knestrick, dated October 26,
2006 indicating Wolfe requested refills of his medication, had a
normal physical examination, had abnormal lab results that
demonstrated an elevated white blood count, AIC 7 and good lipids,
weight of 248 pounds and no open areas on his feet. Dr. Knestrick
directed him to continue his current medications and return in
three (3) months (R. 273);

6.    A June 7, 2007 report from Dr. Knestrick, indicating a
normal physical examination, weight of 254 pounds, and no open
areas on his feet. Dr. Knestrick noted that fifty percent of the
twenty minute session involved a discussion of the abnormal lab

results, the need for Wolfe to take his medications as prescribed, and the possible effects of failure to comply with his prescribed medical regime (R. 270);

7.    A July 7, 2007 report from Dr. Knestrick, indicating a normal physical examination except for a small herniation of the umbulicus, a discussion of lab results, weight of 252 pounds, and counseling regarding diet and exercise (R. 267). Dr. Knestrick instructed Wolfe to continue his current medications, go to the ER if the hernia could not be pushed back in, keep up the good blood sugar and blood pressure control, and return in six months (R. 268);

8.    A February 27, 2008 progress note from Nathan Kesner, D.O., WHR, indicating that Wolfe

> . . . states he is doing well, just fat.  He
> states he is taking medications for his blood
> pressure, it runs normal.  He thinks if he
> lost 50 lbs it would be a lot better.  He
> states that his sugars are running 120-130,
> and he keeps them there. He has been on
> insulin since he was twelve.  He is a type I
> diabetic.  He is taking N/R.  He has been
> taking 18 regular and 60 N about twelve hours
> apart.  He does have a bad tooth though.  He
> states he used to work at Ora Met.  He just
> finished his associate's degree.

(R. 264). Physical examination was normal except for cervical, thoracic and thoracic joint pain and a weight increase to 262 pounds. (R. 265). Dr. Kesner noted as his plan of treatment:

> Continue the medications that he [Wolfe] is already taking.  He has been diabetic for a long time.  He admits that he thinks most of his problem is because he has gained so much weight.  Before we make any medication changes he does wish to try some therapeutic lifestyle changes and drop about 25-50 pounds if possible.  I explained to him the benefits of doing so.
>
> He understands his insulin regimen well and he has been following it closely.  We will check his HbA1c and see how he has been for the past several months.  But for now we will continue the same meds.

(R. 265);

9.   A July 2, 2008 progress note from Dr. Kesner, indicating that Wolfe

> . . . states he has an appointment on 7/8 with SSI Disability due to his inability to get hired because of his diabetes.  He states that his sugars have been running quite controlled lately. He states that he is trying to keep it around 110-120... He notices that his blood sugar drops with exercise so he takes more or less depending on his level of activity.

(R. 253). Dr. Kesner instructed Wolfe to continue his current medications, obtain labs as requested, and follow up as required. Dr. Kesner also noted:

He [Wolfe] is having some lows, which put him
at risk. However, having the tight control has
helped him tremendously as he currently has no
neuropathy. Will check the urine. He will need
to see Dr. Anwar for a vision test.

His bp is elevated today. Will need to
increase his meds pending his blood work.

He would like to get on Social Security
disability, but his main problem is
hypoglycemia. He controls his insulin very
tightly, but if we did not control it so
closely, it is unlikely that he would have the
lows which cause him trouble. I do not believe
he would be eligible for social security based
on this. If we adjust his insulin, we should
be able to find an acceptable level where he
isn't having hypoglycemia.

Patient verbalized or demonstrated
understanding of the above counseling or
education and plan.

Diabetic foot examination was normal with no neuropathy (R. 254);

10. A July 25, 2008 form for state Medicaid benefits
completed by Dr. Kesner, in connection with Wolfe's disability
benefits application, indicating a diagnosis of Type I Diabetes
Mellitus and hypoglycemia. Dr. Kesner noted Wolfe's condition was
under "good control" with no neuropathy or retinopathy and
identified his sole employment limitation as "occasional lows" (in
blood sugar) that result in an inability to handle large machinery
(R. 262-263);

11.  An August 12, 2008 eye examination report from Joseph Audia, O.D. indicating no visual complaints and a visual acuity at 20/20 in both eyes (R. 237). The diagnosis was diabetes without retinal involvement, cataracts with no current visual impact, myopia, astigmatism and presbyopia, requiring glasses (R. 237);

12.  An October 15, 2008 progress note from Dr. Kesner, indicating:

> He [Wolfe] states his blood sugars have been running fairly good. He states he has been depressed over the disability thing. He states he has been doing what he can on the side.  He did lay tile this morning. He states he has not had any low blood sugars since the last time he has been here. He states it fluctuates of course.

(R. 248).  Physical examination was normal with a weight of 259 pounds. Dr. Kesner stopped Wolfe's Humulin R and N and started Lantus 30 Unis qhs with Humalog, increased HCTZ to 25 mg, and directed him to follow-up as scheduled.  Dr. Kesner noted that he would discuss this plan with Joyce Zambito (R. 248, 249);

13.  An October 15, 2008 report from WHR indicting that Wolfe had met with Joyce Zambito to discuss his diabetes management treatment plan.  The assessment indicated Diabetes Type I and obesity.  Joyce Zambito, RN, MS, CDE, noted that fifty percent of the one-hour examination had been devoted to counseling and

coordinating care. Wolfe was directed to bring a completed blood sugar log book to his next appointment, to continue his medications as prescribed, to call if problems occurred and to follow-up with Dr. Kesner as scheduled. (R. 247);

14. A June 4, 2009 letter from Trent G. Mason, M.D. to Wolfe's attorney indicating:

> I do believe in my medical opinion that he [Wolfe] is medically disabled. I don't believe that he can keep and sustain any gainful meaningful employment and work forty hours a week. Unfortunately, since the age 12 he is an insulin dependent diabetic. This has also led to other medial problems such as high blood pressure and hyperlipidemia. He is currently trying to control his diabetes with Lantus and Humalog which are two different types of insulin. Unfortunately, he has unstable, brittle, labile Type I Diabetes, that gives him unpredicted blood sugars and has left him numerous times with syncopal episodes and low blood sugar attacks and many trips to the ER in an ambulance because of this. Mr. Wolfe tries his best every day to keep his blood sugar under control. Along with his insulin his other medications include
>
> 1.   HCTZ
> 2.   ACCUPRII
> 3.   TRICOR
> 4.   NORVASC
>
> There are many types of jobs that he may qualify for as far as his actual skills go but unfortunately because he needs to test his sugar often he is not a candidate for these jobs because he has to have access to his blood sugar kit. I don't believe that he can

> sustain any type of employment because of
> this. I am writing this letter because I felt
> that Mr. Wolfe is disabled and I will offer my
> medical support for this condition.

(R. 308); and

15. A July 28, 2009 letter from Robert B. Wade, M.D. to
Wolfe's attorney indicating  that he had known Wolfe for several
years and was well aware that Wolfe's long-standing Type I Diabetes
caused frequent hyperglycemic [sic] episodes to occur with no
warning despite frequent monitoring(R. 309). Dr. Wade noted:

> Obviously having unannounced hyperglycemic
> [sic] episodes make it difficult to be
> employed. Mr. Wolfe is trained as a machinist.
> A hypoglycemic episode in a machine shop could
> be detrimental to Mr. Wolfe as well as others
> working in the shop.
>
> Mr. Wolfe also has difficulty working shift
> work. He takes multiple medications to control
> his blood sugar, cholesterol and blood
> pressure. Variations in his daily routine make
> blood sugar control more difficult.
>
> I would consider Mr. Wolfe unemployable and
> disabled secondary to his labile blood sugar.
> The fact that he has no forewarning of an
> impending hypoglycemic episode makes it very
> difficult for him to find and sustain
> employment.

(R. 309).

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

### VI.  <u>DISCUSSION</u>

Wolfe objects to sub-sections D ("The ALJ Properly Evaluated the Medical Source Opinions of Dr. Mason and Dr. Wade as Required by the Regulations and Gave Proper Weight to Dr. Kesner's Opinions") and E ("The ALJ Weighed All the Relevant, Probative and Available Evidence in Arriving at His Decision") of the R&R. Specifically, he contends that the ALJ failed to follow the criteria established in 20 C.F.R. 416.927(d). The Court will address each of these objections in turn.

## A.   <u>The ALJ'S Evaluation of the Opinions of Drs. Mason, Wade[2] and Kesner</u>

Wolfe contends the Magistrate Judge erroneously adopted the assignment of weight attributed by the ALJ to the opinions of Drs. Mason and Wade, and also erred when he adopted the ALJ's designation of Dr. Kesner as a treating physician whose opinion was entitled to greater weight. (Pla.'s objs)

20 C.F.R. § 416.927(d) establishes the procedure an ALJ must follow when weighing any medical opinion. It provides that an ALJ must evaluate every medical opinion received regardless of its source. Subsections (1) and (2) of that regulation, however, direct that an ALJ will generally assign greater weight to opinions from:

---

[2]     Referenced in the record as Dr. Lee.

1) a source who has examined a claimant rather than a non-examining source; and

2) a treating source who provides a detailed, longitudinal record of treatment for the medical impairment. 20 C.F.R. § 416.927(d)(1) and (2).

Subsections (2)(i) and (ii), (3) and (4) of § 416.927(d), moreover, provide that, when an ALJ does not assign controlling weight to a treating source's medical opinion, he must consider all of the following factors in deciding what weight to assign that opinion:

> (2) (i) *Length of the treatment relationship and the frequency of examination:* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source;

> 2(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. . . When the treating source has reasonable knowledge of

14

your impairment(s), we will give the source's
opinion more weight than we would give it if
were from a nontreating source;

(3) *Supportability*.  The more a medical source
presents relevant evidence to support an
opinion particularly medical signs and
laboratory findings, the more weight we will
give that opinion. Furthermore, because
nonexamining sources have no examining or
treating relationship with you, the weight we
will give their opinions will depend on the
degree to which they provide supporting
explanations for their opinions. We will
evaluate the degree to which these opinions
consider all of the pertinent evidence in your
claim, including opinions of treating and
other examining sources; and

(4) *Consistency*.  Generally, the more
consistent an opinion is with the record as a
whole, the more weight we will give to that
opinion.

20 C.F.R. § 416.927(d)(2)(i) and (ii), (3) and (4).

1.   Trent G. Mason, M.D.

The ALJ  determined that the record failed to substantiate

that a treating doctor-patient relationship existed between Dr.

Mason and Wolfe, and also failed to substantiate Dr. Mason's

opinion that Wolfe had "brittle, labile diabetes that resulted in

numerous syncopal episodes and low blood sugar attacks."

Furthermore, the ALJ noted that Dr. Mason's opinion not only was

inconsistent with the objective medical evidence of record, but

also that Dr. Mason had attempted to opine on an issue reserved exclusively to the Commissioner. (R. at 17)

Significantly, Wolfe's own testimony at the hearing supported the ALJ's conclusion that Dr. Mason cannot be considered a treating physician:

> Q    And this [Dr. Mason]  is the doctor that you see
>      regularly?  How long have you been seeing him?
>
> A    Yes Sir, I've been a good while and he helps take
>      care of me when I need, if I  needed something
>      being uninsured.
>
> Q    Okay.  Is he a family practitioner?
>
> A    Yes, sir, yes sir
>
> Q    How long have you seen him in the last couple of
>      years?
>
> A    Nothing on record.  You know, he lives out in the
>      hill from me a couple of miles.

(R. 34).

Regarding Dr. Mason's opinion letter, the ALJ explained why he did not give significant weight to that letter as follows:

> . . . First, Dr. Mason does not have a
> treating relationship with the claimant. The
> claimant testified at the hearing that he was
> an acquaintance of his, the claimant had never
> been to his office and that he had treated him
> 'outside' of his office.  There is nothing in
> the record from this doctor.  Second, the
> undersigned noted that Dr. Mason's statement
> that the claimant has brittle, labile diabetes
> is  not  supported  by  the  records  of  the

claimant's treating doctors, which indicate
that his diabetes has been consistently well-
controlled. His statement that the claimant
has made numerous emergency room visits is
also not supported by the medical evidence.
The undersigned notes that Dr. Mason's opinion
that the claimant is disabled is an opinion on
an issue reserved to the Commissioner (20 CFR
404.1527(e0910 and 416.927(e)(1). Further, his
opinion that the claimant would be unable to
work due to the need to check his blood sugar
is an opinion that should be addressed by a
vocational expert. Therefore, the undersigned
has given little weight to this opinion.

(R. 17)

        2.  Robert B. Wade, M.D.

    After reviewing Robert B. Wade, M.D.'s ("Dr. Wade") July 28,

2009 letter, the ALJ determined that he was not a treating

physician and did not assign significant weight to Dr. Wade's

opinion. He explained his decision as follows:

        . . . He [Dr. Wade] indicated that he had
        known the claimant for several years, and was
        aware that he had longstanding type I
        diabetes. He stated that the claimant suffered
        from frequent hyperglycemic [sic] episodes of
        which he had no forewarning, and that, despite
        frequent blood sugar monitoring, the claimant
        continued to have difficulty with labile blood
        sugars. Dr. Wade stated, 'A hypoglycemic
        episode in a machine shop could be detrimental
        to Mr. Wolfe as well as others working in the
        shop.' He indicated that the claimant also had
        difficulty doing shift work, as variations in
        his daily routine made blood sugar control
        more difficult. Dr. Wade opined, 'I would
        consider Mr. Wolfe unemployable and disabled

secondary to his labile blood sugar. The fact
that he has no forewarning of an impending
hypoglycemic episode makes it very difficult
for him to find and sustain employment.' The
undersigned has given little weight to Dr.
Wade's opinion. The claimant testified at the
hearing that he was not a patient of Dr. Wade,
and had never seen him at his office. . . .
The claimant does not have a treating
relationship with Dr. Wade either. Further,
Dr. Wade's statement that the claimant's blood
sugar was labile is not supported by the
records of the claimant's treating physicians.
As noted previously, these records indicate
that the claimant has good blood sugar control
especially when compliant with treatment. The
record does not indicate that the claimant has
experienced frequent hyperglycemic or
hypoglycemic episodes. Dr. Wade's opinion that
the claimant was unable to work as a machinist
or in any other job is an opinion on an issue
reserved to the Commissioner (20 CFR
404.1527(e)(1) and 416.927(e)(1).

(R. 17)

Wolfe provided the only other reference of record regarding

Dr. Wade during his testimony, when he stated that he had never

seen the fellow [Dr. Wade] you know to go into
his office but he's in practice with Dr. Mason
and he knows what I go through and being
without insurance you know, if I needed
something or a prescription or something he
would help me out.

(R. 309).

The ALJ determined that the evidence of record did not support

Dr. Wade's claim that, despite frequent monitoring, Wolfe had

18

frequent hyperglycemic or hypoglycemic episodes. In fact, the ALJ noted that the record established that when Wolfe adhered to his prescribed medical regime his blood sugar generally appeared to be under control. Specifically, the ALJ referenced:

1) the April 19, 2004 emergency room note documenting a hypoglycemia, syncopal episode;

2) the September 17, 2004 emergency room note documenting a hypoglycemic reaction;

3) the treatment notes from Wheeling Health Right from 2005 through October 2008 that consistently indicated Wolfe's diabetes was generally well controlled and his biggest problem was controlling his weight;

4) the July 2, 2008 report from Nathaniel Kesner, M.D. noting a normal general examination with no evidence of neuropathy;

5) the July 25, 2008 physician's summary from Dr. Kesner indicating a diagnosis of type I diabetes mellitus and hyypoglycemia with no neuropathy or retinopathy and occasional blood sugar lows that would limit Wolfe's ability to handle large machinery; and

6) the October 15, 2008 report indicating that Wolfe continued to use alcohol and tobacco, that his weight continued to be 259 pounds, that he had not experienced any hypoglecemic episodes since

his last appointment, and that (contrary to Wolfe's testimony that he had not performed any work, even on the side) he reported laying tile.

    3.  <u>Nathaniel Kesner, M.D.</u>

The ALJ noted that, for the period from 2005 through October 2008, the records from WHR consistently documented that, as long as Wolfe complied with his medical regime, his diabetes was under good control and he had no neuropathy or visual impairments. The ALJ specifically noted the July 2, 2008 report from Dr. Kesner, one of Wolfe's treating physicians at WHR, which documented a normal physical examination with no evidence of neuropathy, as well as Wolfe's statement that he was trying to obtain Social Security disability based on his inability to get hired because of his diabetes (R. 16).

The ALJ also noted a July 25, 2008 physician's summary completed by Dr. Kesner indicating that when he last examined Wolfe on June 30, 2008 his diagnosis was type I diabetes mellitus and hypoglycemia, and that he did not "believe he [Wolfe] would be eligible for social security based on this" (R. at 16).

The ALJ reviewed the WHR records for the time period extending from October, 2006 through February, 2008, and determined that the recorded blood pressures and blood sugars were generally normal

despite significant gaps in treatment (R. at 15). He specifically
noted:

1)    the March 3, 2005 note from Wolfe's first consultation at
WHR which diagnosed him with type I diabetes, hypertension and
hyperlipidemia, all of which were noted to be under "pretty good
control" (R. at 15);

2)    the August 31, 2006 note indicating Wolfe was doing well
and going to school (R. at 15);

3)    the notes from October 2006, June and July 2007
reflecting that Wolfe reported doing well; and

4)    the February 27, 2008 note reporting his blood sugars
were staying between 120 and 130, his blood pressure was normal and
that his main problem was his weight.

The ALJ determined that Wolfe's treatment at WHR, including
treatment by Dr. Kesner, was well-documented and supported by the
weight of the evidence. Having concluded that Dr. Kesner met the
criteria to be considered a treating physician, he then reasonably
assigned greater weight to Dr. Kesner's opinion. (R. 16)

The Magistrate Judge concluded that the ALJ had considered all
of the factors required by 20 CFR § 416.927(d), and had correctly
determined that neither Dr. Wade nor Dr. Mason was a treating
physician. He also determined that there was substantial evidence

in the record to support the ALJ's decision assigning greater weight to Dr. Kesner's opinion. (R&R 23).

**B.    The ALJ's Weighing of the Relevant, Probative and Available Evidence in Arriving at His Decision**

Wolfe next argues that the ALJ failed to weigh and consider all of the relevant, probative and available evidence prior to determining Wolfe's credibility. (Pla's Objs dkt. no. 16)). Specifically, Wolfe contends that the ALJ failed to properly consider his testimony regarding the number of hypoglycemic episodes he experienced in a year. (R&R 25).

SSR 96-7p establishes the factors an ALJ must consider when assessing the credibility of an individual's statements regarding symptoms and their limiting effects, and directs the ALJ to explain the reasons for his credibility determination in his decision. SSR 96-7p(1), (2) and (4) particularly emphasize that:

> 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.
>
> 2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be

> expected to produce the symptoms has been
> established, the intensity, persistence,
> and functionally limiting effects of the
> symptoms must be evaluated to determine
> the extent to which the symptoms affect
> the individual's ability to do basic work
> activities. This requires the adjudicator
> to make a finding about the credibility
> of the individual's statements about the
> symptom(s) and its functional effects.
>
>                  . . .
>
> 4. In determining the credibility of the
> individual's statements, the adjudicator
> must consider the entire case record,
> including the objective medical evidence,
> the individual's own statements about
> symptoms, statements and other
> information provided by treating or
> examining physicians or psychologists and
> other persons about the symptoms and how
> they affect the individual, and any other
> relevant evidence in the case records. An
> individual's statements about the
> intensity and persistence of pain or
> other symptoms or about the effect the
> symptoms have on his or her ability to
> work may not be disregarded solely
> because they are not substantiated by
> objective medical evidence.

SSR 96-7p(1), (2) and (4).

In <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996), the Fourth
Circuit established a two-prong analysis for ALJs to follow when
assessing credibility.  First, an ALJ must establish the existence
of a medical impairment that could reasonably be expected to
produce "not just pain, or some pain, or pain of some kind or

severity, but *the pain the claimant alleges she suffers*." <u>Id.</u> at 593. Once the threshold determination of an existing medical impairment is met, the ALJ must next consider the credibility of a claimant's allegations of pain in light of the entire record. <u>See id.</u> at 595. Social Security Ruling 96-7p provides that an ALJ must consider the following factors in making a credibility determination:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

In <u>Shively v. Heckler</u>, 739 F.2d 987, 989-90 (4th Cir. 1984),
the Fourth Circuit held that, because an ALJ has the opportunity to
observe the demeanor of the claimant, his conclusions concerning
the claimant's credibility are given great weight. Nevertheless, as
noted previously, SSR 96-7p (2) requires that an ALJ's
determination or decision "must contain specific reasons for the
finding on credibility, supported by the evidence in the case
record."

Here, it is undisputed that Wolfe has a medically determinable
impairment that could reasonably be expected to cause some of the
symptoms he alleged. (R. at 19). The record also establishes that
the ALJ considered and addressed all seven factors listed in SSR
96-7p in his decision. Specifically, the ALJ noted that:

1)   Wolfe's alleged disability onset date was related to the
closing of the business by the employer following a strike;

2)   Wolfe attended school full time during 2006 to 2007 and
obtained an AA degree; and

3)   Wolfe admitted in October 2008 that he had been laying
tile and doing other work "on the side". (R. at 19)

Next, the ALJ reviewed Wolfe's testimony regarding the
location, duration, frequency, and intensity of his symptoms. Wolfe
testified

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

1)    that he had hypoglycemic episodes once every seven to eight days that come on without warning and caused disorientation;

2)    that his last visit to the emergency room occurred about one year ago;

3)    that, due to unexpected hypoglycemic episodes, he does not drive a lot;

4)    that he checks his blood sugar every two hours when he is awake, and that it takes him ten minutes to check it and take his shot;

5)    that he needs a private, sanitary area to do this;

6)    that unpredictability and resulting disorientation caused by these episodes is his big problem now;

7)    that Wolfe's treating physicians at WHR scheduled his appointments at six month intervals; and

8)    that Wolfe admitted that he had attempted but failed to comply with his prescribed diabetic diet.

(R. 18-19)

The ALJ also reviewed and considered all of the medical opinion evidence in the record, and noted that:

1)    even though Dr. Kesner's opinion regarding the claimant's eligibility for disability (Exhibit 5F) is an opinion on an issue reserved to the Commissioner (20 CFR 404.1527 (e)(1) and 416.927

(e)(1)), Dr. Kesner refused to opine that Wolfe was unable to work and his opinion was supported by the evidence; and

2)    the opinions offered by Dr. Wade and Dr. Mason (Exhibits 8F and 9F) could not be considered as statements from treating or examining physicians, were not supported by the evidence in the record, and attempt to opine on an issue reserved to the Commissioner.

(R. 20).

When he determined that the evidence failed to support Wolfe's statements regarding the effects of his symptoms on his ability to work, the ALJ considered and evaluated all the evidence in light of the seven factors listed in SSR 96-7p. Thus, he clearly satisfied the second prong of Craig, as well as the analysis required under SSR 96-7p.

The ALJ's conclusion that Wolfe's statements concerning the "intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 19) is based on a reasonable evaluation of the evidence of record. He determined that such evidence did not support Wolfe's allegation that he has 40-50 hypoglycemic episodes per year (Pl.'s Br 7). In fact, the ALJ noted that  Wolfe had visited an emergency room only two times in 2004,

27

both of which occurred before the alleged onset date of his disability. (Exhibits 1F and 2F) (R. 19).

## VII. <u>CONCLUSION</u>

The Court concludes that Wolfe has not raised any issues that were not thoroughly considered in the R&R of Magistrate Judge David J. Joel. Moreover, following an independent <u>de</u> <u>novo</u> consideration of all matters now before it, the Court is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances before it in this action.  It therefore **ACCEPTS** Magistrate Judge Joel's R&R in whole and **ORDERS** that this civil action be disposed of in accordance with the recommendation of the Magistrate Judge. Accordingly, the court

1.    **DENIES** the plaintiff's motion for Summary Judgment (dkt. no. 12);

2.    **GRANTS** defendant's motion for Summary Judgment (Docket No. 13); and

3.    **DISMISSES** the case **WITH PREJUDICE** and **RETIRES** it from the docket of this Court.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58. The Court directs the Clerk of Court to transmit copies of this Order to counsel of record.

DATED: August 16, 2011


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE